```
 1                 UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

 4

 5    JUNIOR SPORTS MAGAZINE, INC.,        )
      RAYMOND BROWN, CALIFORNIA YOUTH      )
 6    SHOOTING SPORTS ASSOCIATION, INC.,   ) CASE NO.
      REDLANDS CALIFORNIA YOUTH CLAY       ) 22-CV-04663-CAS
 7    SHOOTING SPORTS, INC., CALIFORNIA    )
      RIFLE & PISTOL ASSOCIATION,          )
 8    INCORPORATED, THE CRPA FOUNDATION,   )
      AND GUN OWNERS OF CALIFORNIA, INC.;  )
 9    AND SECOND AMENDMENT FOUNDATION,     )
                                           )
10                    Plaintiffs,          )
                                           )
11          vs.                            )
                                           )
12    ROB BONTA, in his official capacity  )
      as Attorney General of the State of  )
13    California; and DOES 1-10,           )
                                           )
14                    Defendants.          )
      _____)
15

16

17             REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA ZOOM

18                     MONDAY, OCTOBER 17, 2022

19                         11:14 A.M.

20                     LOS ANGELES, CALIFORNIA

21

22    _____

23              MAREA WOOLRICH, CSR 12698, CCRR
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST FIRST STREET, SUITE 4311
                LOS ANGELES, CALIFORNIA 90012
25                    mareawoolrich@aol.com
```

UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFFS:**

4        Michel and Associates PC
         By:  Anna M. Barvir
5        180 East Ocean Boulevard, Suite 200
         Long Beach, CA 90802
6        Telephone:  (562) 216-4444

7        Law Offices of Donald Kilmer
         By:  Donald E. J. Kilmer, Jr.
8        14085 Silver Ridge Road
         Caldwell, ID 83607
9        Telephone:  (408) 264-8489

10

11   **FOR DEFENDANTS:**

12       California Department of Justice
         By:  Kevin James Kelly
13       300 South Spring Street, Suite 9012
         Los Angeles, CA 90013
14       Telephone:  (213) 269-6615

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 17, 2022

2                        11:14 A.M.

3                         -oOo-

4

5          THE COURTROOM DEPUTY:  Calling Calendar Item 4,

6    Case No. CV 22-4663, Junior Sports Magazine Incorporated,

7    et al. versus Rob Bonta.

8               Counsel, please state your appearances.

9          MS. BARVIR:  Good morning.  Anna Barvir for

10   Plaintiff Junior Sports Magazine, Brown, California Youth

11   Shooting Sports Association, Redlands California Youth Clay

12   Shootings Sports Inc., CRPA, CRPA Foundation, and Gun Owners of

13   California.

14          THE COURT:  Good morning.

15          Mr. Kilmer, we can't hear you.

16          MR. KILMER:  (Muted.)

17          THE COURT:  Your mute is still on.

18          MR. KILMER:  There we go.  I apologize for that.

19          THE COURT:  No problem.

20          MR. KILMER:  Donald Kilmer for the Second Amendment

21   Foundation, Your Honor.  Ms. Barvir will be speaking this

22   morning.

23          THE COURT:  All right.  Very well.

24          MR. KELLY:  Good morning, Your Honor.  Kevin Kelly,

25   Deputy Attorney General, for Defendant Rob Bonta.

1          THE COURT:  Okay.  Good morning, everyone.  My

2    apologies that we are starting so late.  We tried to finish up

3    everything on the 11:00 calendar.  So the remaining time will

4    be yours.

5          I know you have the tentative.  I realize it's

6    lengthy, to put it mildly.  But I imagine that the plaintiffs

7    will want to be heard.

8          So, Ms. Barvir, if you wish to proceed.

9          MS. BARVIR:  Thank you, Your Honor, for your time

10   this morning.

11         THE COURTROOM DEPUTY:  Before you start, Counsel, if

12   you can make sure all other electronic devices are moved away

13   just to make sure that there's no feedback or whatnot.  And

14   once there is some feedback, if anybody is not speaking, please

15   mute yourselves, and we'll help you through it.

16         THE COURT:  I'm here.  I'm trying to open the

17   window.

18         THE COURTROOM DEPUTY:  Thank you.  I'm sorry,

19   Ms. Barvir.

20         THE COURT:  I'm back.

21         MS. BARVIR:  Thank you.  Is that better?  No.

22         Is that better?  Okay.  Thank you.

23         California has chosen to ban all firearm industry

24   members from engaging in any speech promoting a firearm-related

25   product if that speech constitutes advertising or marketing

1    that might reasonably appear to be attractive to minors.

2         In doing so, California has adopted a broad ban on

3    speech about items that are not only entirely lawful to use and

4    possess by both adults and minors even in California but are

5    constitutionally protected under the Second Amendment.

6         In service of California's supported interest in

7    preventing the unlawful use of firearms by minors and in

8    protecting its citizens, especially children, from gun

9    violence, the speech ban is at once both overinclusive and

10   underinclusive.

11        This, plaintiff posits, is fatal to the state's case

12   no matter what level of scrutiny applies if the Court is

13   looking at this as a pure speech restriction subject to strict

14   scrutiny or whether the Court adopts the traditional Commercial

15   Speech Doctrine analysis as the tentative did.

16        As the judi- -- district Court held in *Tracy Rifle*

17   *v. Pistol versus* -- excuse me.  As the district Court held

18   in --

19        THE REPORTER:  Counsel --

20        MS. BARVIR:  -- *Tracy Rifle and Pistol v. Harris* --

21        THE REPORTER:  Counsel --

22        MS. BARVIR:  -- California has an array of policies

23   at its disposal to combat the perceived problem of unlawful

24   possession and unlawful use of firearms by minors in

25   California.

1              None of this policy choices involve restricting

2    speech in any way, and because such options are available to

3    the state, it must resort to them.  What it cannot do is to ban

4    speech to both minors and adults about products that are not

5    only lawful for minors to use, though under adult supervision

6    or with parental consent, but more importantly, again, are

7    constitutionally protected.

8              In light of the concerns in the Court's detailed

9    tentative, plaintiffs wish to request one point of

10   clarification --

11             THE REPORTER:  Counsel --

12             MS. BARVIR:  -- and address --

13             THE REPORTER:  Counsel --

14             MS. BARVIR:  -- two potential misunderstandings that

15   plaintiffs --

16             THE COURT:  Okay.

17             MS. BARVIR:  Thank you.  To clarify, I would like to

18   ask whether the -- whether my clients print or display

19   disclaimers in all of their publications and advertisements say

20   something like no information about firearms-related product in

21   this publication are intended to promote a commercial

22   transaction.  If they did, would they be facing prosecution or

23   civil penalty under AB 2571, the challenged law?

24             As the law is written, plaintiff cannot be sure

25   which, I think, goes a bit -- excuse me -- to the vagueness and

1    overbreadth we've mentioned throughout our briefing.

2            THE COURT:  Well, I think it's always been --

3            MS. BARVIR:  Thank you.

4            As to my next point, holding that AB 2571 only

5    restricts commercial speech, the tentative focuses only on the

6    direct ban on traditional advertisement and marketing of

7    firearms-related products.

8            But in our supplemental briefing and supplemental

9    declarations, however, plaintiffs have laid out in quite

10   explicit detail about how the law indirectly but just as

11   intentionally as is evident throughout the legislative history

12   of AB 2571, especially in documents that show contempt for

13   named Plaintiff Junior Sports Magazine's Magazine Junior

14   Shooters bans all pure speech engaged in when Youth Shooting

15   magazines cannot be distributed or events cannot be held in

16   California because those magazines and events necessarily rely

17   on the banned commercial speech for their very existence.

18           California's ban on firearm-related speech does not

19   only directly bars Junior Sporting magazines -- Junior Sports

20   magazines and other plaintiffs from -- from publishing their

21   traditional ads about firearms-related products and articles

22   endorsing those products.  It also indirectly bars all the

23   speech found at -- within the pages of Junior Shooters magazine

24   and other similar magazines for youth.

25           That is, the law forces Plaintiff Junior Sports

1    magazine to choose between either barring all ads for

2    firearm-related products, a substantial source of funding for

3    the magazine to say the least, risking the magazine's closure,

4    again, then banning all speech or B, keeping those ads and

5    ceasing all distributed -- distribution of its speech to use in

6    California as it should do.

7         In the declaration -- the supplemental declaration

8    of Andrew Fink, he has declared that Junior Sports magazine had

9    to choose the latter, ceasing publishing and distributing of

10   Junior Shooters magazine in California because 2571 passed in

11   June, and it has not because it could not resume that conduct

12   since the ad- -- adoption of AB 160.

13        The California speech ban clearly does not only

14   restrict commercial -- commercial speech, but it also bars a

15   not insignificant amount of pure firearm specific speech that

16   is inextricably linked to that commercial speech.

17        The inability to effectively parse out speech that

18   merely proposes a commercial transaction and the pure speech

19   that encourages the exercise of Second Amendment productive

20   conduct illustrates why -- well why reasons recent Supreme

21   Court cases have begun to nullify or diminish the distinction

22   between so-called commercial speech and other types of speech:

23   Ideological, educational, et cetera.

24        Now, granting all protected speech the full

25   protection of the First Amendment in lieu of judging commercial

1    speech under a separate rubric that looks at whether the

2    advertising is false or misleading and apply something like

3    intermediate scrutiny.

4         Plaintiff argued that the Court should grant

5    plaintiff's speech that same respect.  That said, even if a

6    rational distinction could exist -- could be said to exist

7    between commercial speech and pure speech, the Commercial

8    Speech Doctrine is not a license for governments to create

9    banned subject matters from its publication -- from

10   publication.

11        So moving to the Court's commercial speech analysis,

12   plaintiff recognized that the Court's tentative repeats a line

13   from California's brief that -- and I'm quoting, "California

14   Penal Code 29610" -- and that's the section from -- excuse me.

15   That's a new law that has been introduced in a recent bill.

16   Generally -- I mean, that's a -- that has recently been

17   amended, I'm sorry, by a recent bill.

18        Back to the quote -- "generally prohibits a minor

19   from possessing a handgun and semiautomatic centerfire rifle

20   and as of July 1st, 2023, any firearm."

21        Respectfully, that is not, in fact, the state of the

22   law today nor will it be the state of the law after July 1st,

23   2023.  Minors may, in fact, still possess firearms for lawful

24   purposes, subject not to just narrow exceptions but a common

25   sense exception that requires minors to have adult supervision

1   or consent to engage in firearm conduct.

2           For clarity and for the record on appeal, plaintiffs

3   want to be sure the Court understands that the minors'

4   possession of firearms under adult supervision and consent are

5   the same today as they will be come July 2023.

6           Plaintiffs also want to clarify in case the Court

7   isn't aware that no commercial transaction firearm take place

8   to anyone, let alone minors -- well, legal ones, that is, legal

9   commercial transactions that is -- in California unless a

10  commercial transaction takes place through an FFL.  An FFL is

11  for purposes of firearm sales considered an agent of the

12  Federal Government.  They also must go through a California

13  firearms licensed firearm dealer which is an agent of the

14  California government for the purposes of firearm sales.

15          That means we offer for sale the acceptance,

16  consideration, and delivery of firearms products -- not

17  firearms.  Not other related products that this law also

18  affects -- must take place through a government agent.  And

19  they may only take place after a significant background check

20  and ten-day waiting period.

21          Guns that sold at 7-Eleven or Toys "R" Us, they are

22  not readily available for unlawful purchase by minors as, say,

23  tobacco or alcohol.  But the Court's tentative relies very

24  heavily on case law analyzing restrictions on commercial speech

25  pertaining to such substances.  And I can see -- and plaintiff

1    can see the temptation to do that.

2          But when it's clear that California law does not

3    (inaudible) minors from lawfully possessing and using firearms,

4    it also becomes clear that these cases make for a very poor

5    analogy.

6          Both the state and the Court's tentative rely on

7    cases whereby the courts have permitted advertising

8    restrictions to dampen the demand for products and services to

9    establish that the state may ban -- ban speech to dampen the

10   demand of youth to engage in a shooting sporch -- sport.

11         Respectfully, plaintiffs argue that that reliance is

12   misplaced.  These cases generally deal with restrictions on

13   advertising of products or services like alcohol and tobacco.

14   Other similar restrictions -- other similar cases deal with

15   restrictions on advertising of brothels and gambling and such

16   conduct.

17         They do not speak to restrictions on truthful speech

18   about products that are not only illegal to only use but

19   Constitutionally protected as is the speech that California

20   bars under 2571.

21         Respectfully, plaintiff's posit that the more apt

22   analysis would be -- excuse me -- found under *Carey v.*

23   *Population Services*.  Like the unconstitutional ban on

24   advertising contraceptives to children and adults, in theory,

25   AB 2571 seeks to suppress information about the availability of

1    and price of constitutionally protected products.

2         It cannot be said, as the Court's tentative

3    acknowledges, to prohibit only misleading ads or only ads

4    proposing illegal transactions.  Nor can it be characterized as

5    directed to inciting or producing imminent lawless action.

6         To the contrary, the speech that plaintiffs engage

7    in and which is, in fact, banned by AB 2571 does not propose

8    that minors engage in lawful sales -- unlawful sales or the

9    unlawful use of firearms.  It pertains to lawful and

10   constitutionally-protected conduct, and it targets speech to

11   both adults and minors as long as that could be considered

12   reasonably attractive to minors who might seek market

13   information about lawful firearms for lawful use.  And so, as

14   in *Carey*, the state cannot ban plaintiff's speech.

15        Unless the Court has in anything else or thinks

16   additional briefing could assist the Court in understanding the

17   issues with regard to the state of the law regarding transfer

18   of firearms, plaintiffs would rest.

19        THE COURT:  All right.  I appreciate that.  You had

20   a lot to say.  A lot of that is in your moving papers.

21        I guess I'd like to hear from Mr. Kelly first.  I

22   must say that I think you assume things about the statute that

23   I just think doesn't cover it.  It doesn't purport to ban sales

24   and limit advertising.  And I think it limits commercial

25   speech.  I know you disagree.

1        But let's hear from Mr. Kelly and see what he has to

2   say.

3        MR. KELLY:  Thank you, Your Honor.  You know,

4   obviously we agree with the vast majority of the Court's

5   tentative ruling.  It was our position that the statute was

6   always Constitutional, and I think the amendment to the law,

7   the recent amendment, makes it clear that it regulates

8   commercial speech and nothing beyond that.

9        I think the plaintiff often bring up examples

10  existing at the margins, and I think they often point to

11  communications regarding the use of firearms-related products

12  by minors, but that is not what the statute is regulating.

13       It's regulating, as you said, marketing and

14  advertising communication of firearm-related products only.

15       So it's difficult to respond to a lot of those

16  arguments about rehashing the Court's reasoning and tentative

17  ruling --

18       THE COURT:  Let me just ask you this.  I think --

19  and I don't mean to interrupt, but that's exactly what I'm

20  doing.  For example, I think you and I agree that several

21  injunction factors are implicated because of the nature of the

22  regulation.

23       I believe that what Miss Barvir is saying is that I

24  have the wrong analogy, that I shouldn't be looking at alcohol

25  cases or cigarette cases and things of that nature.  And I

1  think it's because she believes that the Second Amendment

2  protects gun ownership, and so therefore, a different standard

3  has to apply.

4            And, I guess, what do you say about that?

5            MR. KELLY:  So, Your Honor, I think the analogy is

6  appropriate in this case because I think, as Your Honor pointed

7  out in the tentative decision, the concern here is the

8  prevention of illegal and unsafe firearm use by minors.  That's

9  what the law is addressing here.  That's the purpose of the

10 law, and that's what the law does address here.

11           So I think the constitutionality of minor possession

12 of firearms is not really at issue in this case, and I think

13 it's something the Court really doesn't need to go into here.

14           But I think the Court was absolutely correct in

15 addressing and discussing how the interest deemed further here

16 is the illegal use of firearms by minors.  We put forth data

17 and numbers showing that there is a very real problem with what

18 that the legislation recognized, and it's material submitted

19 along with the bill.  And so in that way, I think the analogy

20 is actually appropriate in the situation.

21           THE COURT:  Okay.  I interrupted you.  Do you want

22 to proceed?

23           MR. KELLY:  Oh, one moment, Your Honor.  I'm sorry.

24           Yes, Your Honor.  So I'll just respond with a couple

25 more of the plaintiff's points.  So they've continually argued

1    that this statute is both overinclusive and underinclusive and

2    that there are other means possible to prevent gun violence

3    involving minors.

4           But I think they are really applying a strict

5    scrutiny standard here.  Intermediate scrutiny is all that's

6    required.  And just because this is not the only solution to

7    the problem does not mean it's a permissible way to address the

8    problem of youth gun violence.

9           I think to the extent that they argue that the

10    definition of being reasonably attractive to minors is too

11    overbroad, it's belied by the statute itself.  It lists very

12    specific factors for a Court to consider.  And, again, it does

13    not -- it is limited to commercial solicitation rather than

14    communications regarding the youth of firearms --

15           THE COURT:  Well, what do you say in response to the

16    argument that the statute effectively requires publishers

17    either to not distribute in California or basically close down?

18           MR. KELLY:  I think that's a conclusory statement.

19    I don't think there's been any evidence other than just a mere

20    statement saying, well, since we can't -- well, first of all,

21    that the advertisements that they purport to want to carry

22    actually run afoul of the law.

23           And secondly, that -- that not being able to carry

24    those advertisements would actually doom their publication.

25    And they are perfectly able to seek sponsorships and financial

1   compensation in other ways.  But again, I don't think they've

2   established significant facts that that would actually be a

3   problem.

4           THE COURT:  Okay.  Anything else you want to cover

5   before I go back to Ms. Barvir?

6           MR. KELLY:  No, nothing else, Your Honor.

7           THE COURT:  Okay.  Ms. Barvir.

8           MS. BARVIR:  Thank you, Your Honor.  I don't have

9   anything to add.  Though I would like to just quickly respond

10  to a few points that I heard my friend speaking to.

11          First, the state -- the --

12          (Audio feedback.)

13          THE COURTROOM DEPUTY:  Try to back up just a little

14  bit.  You might be too close to the microphone.

15          MS. BARVIR:  Thank you.  Is that better?

16          THE COURT:  Yes.

17          MS. BARVIR:  First, the state and the Court's

18  tentative argue that the issue and what is being barred here is

19  illegal use and possession, and that isn't it.  The law does

20  address that, but it's much, much broader than that.  If the

21  law focused only on, perhaps, barring speech for -- excuse me.

22          You know, they literally, I think, targeting and

23  telling minors, hey, buy guns here, perhaps that might be --

24  that might be something that is referencing just illegal

25  contracts or just -- this though is all types of speech

1   including speech regarding and promoting lawful use and

2   possession as long as that speech is attractive to minors.

3          And again, that is speech that might equally be

4   attractive to adults.  So we are not just talking about speech

5   targeting children.  We are talking about speech between

6   adults.  Okay?

7          Second, I believe -- excuse me.  The state is --

8   misunderstands or -- misunderstands plaintiff's argument with

9   regarding -- with regard to the overinclusive and

10  underinclusivity of AB 2571 and points made about having to

11  resort to laws and policies that restrict conduct and not

12  speech.

13         We are not talking about a strict scrutiny standard

14  here.  This argument, taking the lead from *Tracy Rifle v.*

15  *Harris* which was specifically and only about commercial

16  transaction speech -- and that court did, in fact, find that

17  bans on this type of -- I believe it was being able to view

18  images of handguns from outside the store -- excuse me --

19  found that that commercial speech was violative of the First

20  Amendment even under the Commercial Speech Doctrine because

21  there were all of these other things that the state could have

22  done that did not in any way restrict the speech -- the rights

23  of the speech -- the plaintiffs to speak in that case.  That

24  was under a commercial speech analysis, not a strict scrutiny

25  analysis.

1            And finally, the point about whether or not

2    plaintiff had made enough -- shown enough evidence that they'd

3    be put out of business if they couldn't advertise their --

4    advertise as they currently do, I think there's a few things to

5    say about that.

6            A, when the law was passed in June -- excuse me --

7    and took effect immediately, it did not have any of those

8    restrictions.  So they had to -- they weren't clear about

9    what -- exactly what -- that it was not as clear as it perhaps

10   is now.  Though I still think it's not entirely clear even

11   after AB 160.

12           So I think the relevant time period to look at is

13   the end of September when AB 160 took effect.  It is not enough

14   time for them to have even shown that there was an impact on

15   their business.  So the signed affidavit of the owner of that

16   business I think should be sufficient to show that he thinks

17   what they have to do in order to stay afloat is to not

18   distribute to California, and that's a ban on speech to

19   California.

20           Additionally, requiring that they first then go

21   ahead and take all that speech out, this is a nationwide --

22   actually, worldwide distributed publication.  So what

23   California is trying to do in suggesting it's inappropriate is

24   ban speech in other states that do not restrict such speech,

25   and California can't do that either.

1              With that, plaintiffs would rest.

2              THE COURT:  Mr. Kilmer?

3              MR. KILMER:  Your Honor, I didn't hear an answer to

4    Ms. Barvir's question proposed to Mr. Kelly that she made

5    initially.  And that is, is the disclaimer going to fix all of

6    this?  If these publications or websites merely print a

7    disclaimer that no information about firearm-related products

8    in this publication are intended to promote a commercial

9    transaction, are we -- are we safe?  Are we immune from 2571?

10             THE COURT:  Well, I'll leave that to Mr. Kelly

11   because I suspect that the answer is -- that the disclaimer in

12   a general sense may be okay, but then it may not.

13             Mr. Kelly?

14             MR. KELLY:  Yeah, I think that's correct.  I think,

15   again, the statute lays out the totality of circumstances

16   analysis here.  I'm hesitant to say whether -- there are a lot

17   of factors that go into this; right?

18             I think -- and, you know, I'm hesitant to speak on

19   behalf of my office and take a position here on behalf of

20   everyone at my office.

21             But again, I think I would point to the statute.

22   Does it fall under the -- do the communications that the

23   publication is offering fall under the definition of marketing

24   or advertising under the law, and do they constitute being

25   attractive to minors as defined by the law.

1          So I don't think that there's one clear-cut answer

2     there.  And I think, again, you would have to look at the

3     statute for the answer to that and apply it all with different

4     factors that the statute provides for.

5          THE COURT:  I think -- here's the problem, folks.

6     Obviously this is a significant issue for both sides.  We are

7     speaking now in terms of what the statute says and what I and

8     you think is a reasonable conclusion under the statute.

9          There may be instances that are brought forth where

10    as applied, the statute may fail or as applied, it may succeed.

11    But the problem is we don't have a lot before it.

12         But I certainly don't see anything in this

13    legislation that would require the magazine to cease publishing

14    in California.  I think the statute is clear regarding what

15    types of advertising is prohibited; and namely, that is the

16    advertising which is -- that encourages minors to possess and

17    own firearms illegally.

18         I believe it's commercial speech.  It is a much

19    broader prohibition.  But at the end of the day, I do believe

20    the statute, particularly after the amendment, makes clear what

21    the state's intention is, and that is to regulate commercial

22    speech, not other speech, and it is directed toward speech that

23    is intended to encourage or entice people who are ineligible to

24    own guns to want to possess or buy guns.

25         I think on that basis, I think it withstands

```
 1   scrutiny.  But obviously I know the plaintiff vehemently

 2   disagrees.

 3           So I am going to take another look at the ruling in

 4   light of the comments.  But I would not expect me to change

 5   anything dramatically after today's hearing.  So I suppose you

 6   should all plan accordingly.

 7           Okay.  I appreciate your indulgence and your

 8   briefing and all that you have done.  I will try to have

 9   something for you in the next few days.

10           MS. BARVIR:  Thank you, Your Honor.

11           MR. KELLY:  Thank you, Your Honor.

12           MR. KILMER:  Thank you, Your Honor.

13           THE COURTROOM DEPUTY:  Thank you, Counsel.  This

14   Court is adjourned.

15           (At 11:40 a.m. the proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25
```

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7   FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8   THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9   THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12  IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13  CONFERENCE OF THE UNITED STATES.

14

15

16          DATED THIS  28TH  DAY OF NOVEMBER, 2022.

17

18

19          /S/ MAREA WOOLRICH

20          _____
            MAREA WOOLRICH, CSR NO. 12698, CCRR
21          FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**UNITED STATES DISTRICT COURT**